UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JANET M. LINDLEY., | ) |
| | ) |
|   Plaintiff , | ) |
| | ) |
|     vs. | ) CAUSE NO.  2:12-cv-00190-WTL-WGH |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of the Social Security | ) |
| Administration | ) |
| | ) |
|   Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Janet M. Lindley requests judicial review of the final decision of the Defendant, Carolyn W. Colvin, Commissioner of the Social Security Administration ("Commissioner"), denying Lindley's application for Disability Insurance Benefits ("DIB").  The Court, having reviewed the record and the briefs of the parties, rules as follows.

**I.   APPLICABLE STANDARD**

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis.  At step one, if the claimant is engaged in substantial gainful activity she is

not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id*., and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in her decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

2

## II.   BACKGROUND

Lindley was born on August 16, 1966, and was 41 years old at the time of the alleged onset of disability.  Lindley has completed two years of college and has prior relevant work experience as a customer service manager, laborer, field examiner, and patient account manager.  She applied for DIB on December 16, 2009.  In her application for benefits, Lindley alleged that she was disabled due to neck and cervical pain, headaches, myofascial pain, visual loss, speech problems, migraines, and symptoms consistent with obstructive sleep apnea, fibromyalgia, and mood disorder.  In addition, she was diagnosed with temporomandibular joint disorder with notes of tinnitus, vertigo, and daily temporal and occipital headaches.  Her application was denied initially and upon reconsideration, after which she requested and was granted a hearing before an Administrative Law Judge ("ALJ").  On January 27, 2011, Lindley appeared with counsel and testified at an administrative hearing before ALJ Gary. L. Vanderhoof.  ALJ Vanderhoof issued his decision denying Lindley's application on February 14, 2011.  On March 23, 2012, the Appeals Council denied review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner and subject to judicial review.

*Medical Evidence*

In October 2006, Lindley met with a clinical therapist and was initially diagnosed with major depressive disorder, mild and recurrent.  It was recommended that Lindley begin weekly individual therapy.

Lindley met with Dr. Oommen, her primary care physician, several times throughout 2008 and 2009.  In June 2008, she complained of pain everywhere, especially in her head, neck, and arm.  She stated that she had been in pain for five years and has fibromyalgia.  Dr. Oommen's physical examination proved normal, and he prescribed Lyrica for her fibromyalgia

and Topamax for her headaches. Lindley presented for a follow-up appointment on July 8, 2008. At that time, Lindley complained that her medications were causing abdominal pain and indigestion. Dr. Oommen advised her to continue with medications. At the October appointment, Lindley complained that the medications were not helping. Dr. Oommen noted Lindley's weight gain and hypertension. He prescribed Carvedilol and advised Lindley to continue Meloxicam, Cyclobenzaprine, and Hydrocodone.

In January 2009, Dr. Oommen treated her for diabetes mellitus type II ("DM"), hyperlipidemia, menopausal and post-menopausal disorder, and fibromyalgia. On March 3, 2009, Lindley arrived at her appointment wishing to discuss hormone replacement therapy because she was experiencing hot flashes, exhaustion, irritability, lack of concentration, stress and anxiety, and depression. Dr. Oommen prescribed Alprazolam.

In May 2009, Lindley again saw Dr. Oommen. She complained of feeling exhausted and fatigued, and of a sinus infection. Dr. Oommen prescribed a Medrol dose pack and Amoxicillin. On June 9, 2009, Lindley went to the hospital complaining of chest pain and shortness of breath. The doctor recommended a stress test to be done in the future and suggested altering the time in which she takes Topamax in order to alleviate her headaches. Lindley met with Dr. Oommen for a follow-up appointment in September 2010. Dr. Oommen prescribed Onglyza for her uncontrolled diabetes, a nebulizer for COPD, Amoxicillin for bronchitis, and Diflucan. On January, 13, 2011, Dr. Oommen treated Lindley for pain in her neck, head and abdomen.

In addition to treatment for pain, Lindley also sought treatment for her alleged mental disorder. She underwent two mental status evaluations, ordered by the Social Security Administration. On April 26, 2009, Dr. Brophy, a licensed clinical psychologist, diagnosed

Lindley with an adjustment disorder with depressed mood and fibromyalgia. He also assessed her to have a GAF of 60.

Another mental status evaluation was performed in February 2010, by Dr. Hosgett. He also diagnosed Lindley with adjustment disorder with depressed mood. In addition, he determined Lindley suffered from arthritis, degenerative disc disease, fibromyalgia, high blood pressure, diabetes and depression, and assigned her a GAF of 55. In March 2010, Lindley presented for a psychiatric review technique evaluation under the care of Dr. Randal Horton. Dr. Horton similarly found that Lindley had a non-severe impairment of an "adjustment disorder with depressed mood" and coexisting nonmental impairments that required referral to another medical specialty. Dr. Horton noted that Lindley's adjustment disorder only imposed mild limitations on her social functioning, daily living, and ability to maintain concentration, persistence and pace.

In February 2010, Lindley also underwent a consultative examination at the direction of the Social Security Administration. During the examination, performed by Dr. Kassab, Lindley demonstrated a normal gate and was able to bend over and squat. Overall, Dr. Kassab concluded that Lindley had arthralgias, which "could be due to osteoarthritis," and found she was not impaired from sitting, standing, walking, grasping, lifting or carrying. Furthermore, Dr. Kassab opined that "with better arthritis treatment I think she would be able to do her activities of daily living without a problem." *Id.* at 363.

In March 2010, a physical residual functional capacity assessment was completed that indicated that Lindley had no environmental, communicative, visual, or manipulative limitations; however, he did find that Lindley should never climb ropes, ladders, or scaffolds. In addition, the doctor indicated that Lindley was limited to lifting twenty pounds occasionally, lifting ten

pounds frequently, and could sit, stand, and walk for a total of six hours in an eight-hour day. Finally, the physician noted Lindley's diagnoses of fibromyalgia, DM, hyperlipidemia, and obesity.

*Hearing Testimony*

At the hearing, Lindley testified that she was unable to continue working because of her chronic pain. Lindley suffers from fibromyalgia and is a diabetic. She testified that she lives with her husband and does not engage in social activities other than watch television and read books. She also stated that she does grocery shop and travel occasionally to see her parents. Lindley does have a driver's license. She testified that she completes light chores such as loading the dishwasher and will "put away . . . clutter that's accumulated." R. at 48.

After Lindley concluded her testimony, the ALJ heard testimony from Dr. Spector. Dr. Spector did not believe the record showed that Lindley met any Listing. In particular, he noted that the "[c]laimant is experiencing chronic pain that's been described as fibromyalgia in the record and as you know there's no different tests for that or definitive tests for that, but apparently she does complain of that." *Id.* at 40. Dr. Spector further noted that Lindley was a diabetic and suffered from degenerative disc disease and sleep apnea. Dr. Spector commented that Lindley was also morbidly obese. Finally, Dr. Spector testified that Lindley could do sedentary work including lifting and/or carrying up to ten pounds, but could not climb ladders, ropes, or scaffolds, or work at unprotected heights or with dangerous machinery.

The ALJ also heard testimony from Dr. Rogers, a psychologist. Dr. Rogers commented on the opinions rendered by the state agency's doctors. Specifically, Dr. Rogers referenced the consultative examination completed by Dr. Patrick Brophy in which he diagnosed Lindley with adjustment disorder with depressed mood and a global assessment of functioning ("GAF") of 60.

Dr. Rogers also referenced the consultative examination completed by Dr. Stanley Hosgett, who also diagnosed Lindley with adjustment disorder with depressed mood. However, Dr. Hosgett assigned a GAF of 55.

After Dr. Rogers finished her testimony, the vocational expert ("VE") testified. The ALJ asked the VE to consider a hypothetical individual with Lindley's age, education and work experience who could perform work with the following restrictions: lift and carry ten pounds frequently; occasionally postural; stand and walk only two hours out of an eight-hour day; sit six out of eight hours with normal break periods; could not climb ladders, ropes, or scaffolds; and could not work at unprotected heights or around dangerous, moving machinery. The VE testified that such an individual could perform Lindley's past work as a customer service manager for a cable television company, as an account manager for an ophthalmologist, or as a field examiner auditor.

### III.   DISCUSSION

In her brief in support of her motion for summary judgment, Lindley presents two issues for the Court's review. First, she argues that the ALJ failed to weigh and consider all of the evidence in determining her residual functional capacity ("RFC"); and second, she argues that the ALJ's step four determination, finding that she is able to perform her past relevant work as a field auditor was improper. The Court will address all of her arguments, in turn, below.

#### A.  The ALJ's Step Three Determinations

Before she reaches her RFC arguments, Lindley argues that the ALJ committed reversible error in conducting an incomplete analysis at step three in determining whether or not her severe impairments, fibromyalgia and mood disorder, met or medically equaled a Listing. The ALJ found that her joint pain did not meet or equal Listing 1.00 and her depression did not

meet or equal Listing 12.00. Lindley asserts that the ALJ's conclusions were erroneous and not supported by substantial evidence.

Regarding her depression, the Court is not persuaded that the ALJ erred in concluding that Lindley did not meet or medically equal Listing 12.04, affective disorders. The record reflects that Lindley was diagnosed with depression as a result of the pain she experiences. However, her symptoms have always been classified as "moderate" at best. *See* Pl.'s Reply at 5 ("Both [doctors who performed consultative examinations] diagnosed adjustment disorder with depressed mood . . . indicative of *moderate* symptoms or *moderate* difficulty with social and occupational functioning.") (emphasis added). The ALJ recognized that these symptoms certainly would not meet or equal paragraph C,[1] nor did they meet or medically equal the "marked" requirements contained in paragraph B.[2] As such, the Court sees no error in the ALJ's conclusion that "she does not have a mental process that would meet or equal the requirements of the Listings for a mental impairment." R. at 20. Further, while Lindley argues that the ALJ did not explain the weight given to the doctor's opinions, it is clear from the record that the ALJ relied both on Dr. Rogers, the testifying psychologist, and Dr. Horton, the state agency physician, to make this determination. The ALJ did not specifically use the word "weight";

---

[1] Paragraph C requires decompensation or a history of an inability to function outside a highly supportive living arrangement. Neither is present in Lindley's case. *See* www.ssa.gov/disability; R. at 40-41 (Dr. Rogers testified at the hearing that, "there's no psychiatric hospitalization, no episodes of decompensation having to do with psychiatric factors mentioned in any of the records and she doesn't meet the C criteria.").

[2] Paragraph B requires "at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decomposition, each of extended duration." *See* www.ssa.gov/disability; R. at 40-41 (Dr. Rogers testified that Lindley's degree of limitation in each of the first three categories was mild with no episodes of decompensation.).

however, given that all of the doctors found Lindley's depression symptoms to be mild or moderate, the Court does not find this constitutes reversible error.

Lindley also argues that the ALJ "did not consider whether her fibromyalgia ("FM") medically equaled a listing." Pl.'s Reply at 2. Fibromyalgia is not a listed impairment. *See* SSR 12-2P (S.S.A. July 25, 2012).[3] Therefore, the ALJ was required to determine if it medically equaled a Listing. The ALJ stated that "[t]he claimant has arthralgia (joints pain) which does not meet or equal the criteria of the Listings at section 1.00." R. at 20. Lindley, in her initial brief, argues that her fibromyalgia medically equaled Listing 1.02, major dysfunction of a joint(s), and in her reply brief argues her fibromyalgia medically equals Listing 14.09, inflammatory arthritis.[4] The Commissioner is correct that Lindley bears the burden of proving her fibromyalgia and other impairments medical equal Listing 14.09. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.").

Lindley does not specify which subpart she claims to medically equal, nor does the ALJ discuss which subpart he relied on in concluding her impairments did not medically equal Listing 1.00. Nevertheless, the Court agrees with Lindley that "the ALJ simply assumed the absence of

---

[3] The Court is aware that this Social Security Ruling was not issued until after the ALJ made his decision.

[4] At least one other court has recognized the connection between these two Listings. "Listing 1.02 and Listing 14.09 are closely related: Listing 14.00B6, which supplements Listing 14.09, states: When persistent deformity without ongoing inflammation is the dominant feature of the impairment, it should be evaluated under 1.02...." *Shinabarger v. Barnhart*, 1:05-cv-0276-DFH-TAB, 2006 WL 3206338 (S.D. Ind. Mar. 31, 2006) (internal citations and quotations omitted).

equivalency without any relevant discussion." *Barnett v. Astrue*, 381 F.3d 664, 671 (7th Cir. 2004). It is difficult for the Court to determine what evidence, besides the opinion of Dr. Spector[5] and the two Disability Determination ("DDT") forms completed by the state agency physicians, the ALJ based his determination on, because the ALJ's decision cites to no other evidence. While the Commissioner argues that the ALJ was entitled to rely on the DDT forms indicating Lindley's conditions did not meet or medically equal a Listing, this is only the case if there is "no contradictory evidence in the record." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) ("[T]he ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation *only so long as there is no contradictory evidence in the record*[.]") (emphasis added). However, the record is replete with documentation reflecting Lindley's pain due not only to her fibromyalgia but further complicated by other issues. R. at 259-60 ("severe arthritis); *id*. at 335 ("chronic back pain, joint pain, shoulder pain, neck pain"); *id*. at 355 ("degenerative disc, arthritis, fibromyalgia"); *id*. at 401("headaches, degenerative joint disease, disc degeneration in the spine"). The Court finds that the ALJ did not adequately explain his step three decision that Lindley's fibromyalgia did not medically equal either Listing 1.00 or Listing 14.00 nor did he "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). As such, the Court agrees with Lindley that this case should be remanded in order for the ALJ to

---

[5] In her Reply, Lindley takes issue with Dr. Spector serving as the testifying medical expert because "[h]e was not a rheumatologist or someone specializing in the field of chronic pain disease." Pl.'s Reply at 3. However, Lindley was given the opportunity to question his qualifications at the hearing, but chose not to do so. *See* R. at 39. As such, this argument is waived. *See Union Tank Car Co., Inc. v. Occupational Safety & Health Admin.*, 192 F.3d 701, 707 (7th Cir. 1999) ("[F]ailure to present an argument to the ALJ does constitute waiver of the right to raise it on appeal[.]").

consider all relevant evidence, designate a specific Listing and subpart, and thoroughly explain if Lindley's fibromyalgia medically equals one of these Listings.[6]

### B. Erroneous RFC

Before the ALJ proceeded to step four, he determined Lindley's RFC, "her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." R. at 18. Lindley claims the ALJ failed to weigh and consider all of the evidence in making this determination, and, therefore, his RFC determination is erroneous.

#### 1. The ALJ'S Failure to Use the "Special Technique" for Mental Impairments

Lindley argues that that ALJ erred in his mental assessment because he did not use the "special technique" to adequately assess her mental impairments in determining her RFC.

> The special technique requires that the ALJ evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. If the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. These functional areas are known as the B criteria. The first three functional areas are rated on a five-point scale of none, mild, moderate, marked, and extreme. The final functional area is rated on a four-point scale of none, one or two, three, and four or more."

*Craft*, 539 F.3d at 674 (internal citations and quotations omitted). The Commissioner seems to argue that this is harmless error, stating, "Plaintiff argues form over substance," arguing that "[t]he ALJ relied on three doctors who all agreed that the Plaintiff had only mild difficulties in the first three areas and experienced no episodes of decompensation." Def. Response at 6. The Court agrees.

---

[6] The Court expresses no opinion as to if Lindley would medically equal a Listing. It simply notes that due to the lack of discussion of anything other than the DDT forms and the testimony of the medical expert by the ALJ, the ALJ failed to adequately explain how he reached his conclusion.

11

It is clear from the ALJ's decision that he did adequately address her depression symptoms in his RFC analysis, as required by the special technique. The ALJ relied on both consultative examinations where mental status evaluations were conducted. R. at 21, 22. Both of these examinations found that Lindley's symptoms were moderate. *See id*. at 21 ("Her affect was appropriate, and she demonstrated no indication of either hallucinations or delusions. She was oriented and short-term memory was intact. Her concentration was appropriate. Fund of information was appropriate and her abstract reasoning was adequate. Her social judgment and arithmetic ability were adequate."); *see also id*. at 22 ("Her speech was clear and understandable and she expressed herself in a reasonable fashion. There was no indication of a thought disorder. She was oriented time three and her memory was intact."). The ALJ also relied on the evaluation of the B criteria by the testifying psychologist, Dr. Rogers. *Id*. at 23 ("She stated the claimant had mild limitations in performing activities of daily living, mild limitations in social functioning, mild limitations in concentration, persistence and pace, and no evidence of any evidence of episodes of de-compensation, each of extended duration."). After evaluating all of this evidence, the ALJ determined that her depression did not prevent Lindley from completing sedentary work, and substantial evidence in the record supports this finding. The Court sees no reversible error made in the ALJ's failure to explicitly follow the special technique in determining how Lindley's severe mental impairment affected her RFC determination.[7]

---

[7] This should not be read as condoning the ALJ's failure to use the special technique, as required by 20 C.F.R. § 404.1520a. Rather, the Court does not believe a different conclusion would result even if the ALJ would use the special technique on remand. *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) ("The ALJ's application of the special technique is not a model for compliance, but we will not remand a case for further specification when we are convinced that the ALJ will reach the same result. We believe that would occur in this case. The ALJ's failure to explicitly apply the special technique was harmless.") (internal citation omitted).

*2. Fibromyalgia*

Lindley next argues that the ALJ did not properly evaluate her fibromyalgia when determining she had the RFC to perform sedentary work—she goes so far as to say "the ALJ fail[ed] to provide any discussion of the impact of the impairment on the Plaintiff's RFC." Pl.'s Brief at 12. It is clear that the ALJ did recognize Lindley's pain and symptoms—almost four pages of his decision is dedicated to her medical history, symptoms, and doctor visits. However, based on his reliance on medical experts, he still found she was able to perform sedentary work. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not[.]") (internal citations omitted). This was due in large part to the fact that the ALJ did not find Lindley's own testimony regarding her pain to be credible. Fibromyalgia's "cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Id.* at 306. Therefore, Lindley's argument that the ALJ erred in determining her RFC is very much intertwined with her argument that the ALJ erred in finding her own testimony to be not credible.

In his decision, the ALJ relies heavily on Dr. Spector's finding that Lindley would have difficulty performing anything more than sedentary work. This finding was made due to the fact that she has fibromyalgia, diabetes, degenerative disc disease, sleep apnea, and morbid obesity. R. at 35. All of these conditions led the ALJ to conclude she could not do anything other than sedentary work—work that requires mostly sitting and very little lifting. However, Lindley's subjective reports paint a much different picture. She testified that due to her pain, there are days where spends 90% of her time in bed—these "bad days" occur 10-15 times every month. *Id.* at 52. She reported the following on her Function Report:

> I sleep excessively.  Often my sleep is disrupted and restless due to discomfort.
> … Sometimes I go for days or even weeks without leaving the house due to

13

> excessive pain and exhaustion. … I suffer from constant pain. There is never a time when I am not in pain. So much of the time the pain is unbearable. I often struggle to sit/stand for more than just a few minutes at a time. I spend more time in bed than doing anything else because I simply cannot function, the pain is debilitating and unbearable so I just sleep through it.

*Id*. at 204-10. Reducing Lindley to sedentary work does not account for these debilitating symptoms. In determining her RFC, the ALJ found these statements to not be credible because "the medical evidence fail[ed] to support her allegations." In doing so, he relied solely on the objective medical evidence, mainly Dr. Spector's report, despite the fact that fibromyalgia's "symptoms are entirely subjective." *Sarchet*, 78 F.3d at 306. The Court agrees that this was an error.

In examining credibility determinations, the Court will not overturn the ALJ's conclusions "unless they were patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, "[t]he determination of credibility must contain specific reasons for the credibility finding" and "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citing *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007)). SSR 96-7p lists a number of factors that the ALJ must consider in determining the credibility of a claimant. These include, among others, the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; aggravating factors; and medications, treatments, or other remedies that help alleviate the symptoms.

Here, the ALJ's credibility determination does not contain an adequate consideration of these factors, but rather focuses solely on Lindley's lack of hospitalizations, the fact that she only sees her doctors every three months, and her lack of organ damage. Taken together, these statements do not lead the Court to agree with the ALJ that Lindley's statements regarding the

14

"intensity, persistence and limiting effects" of her symptoms to not be credible. On remand, the ALJ should consider a number of the above listed factors, and better explain why he finds her subjective complaints to not be credible. In so doing, he will be better able to adequately address her own subjective complaints of pain in determining an appropriate RFC.

### C. Improper Step Four Determination

Finally, Lindley argues that the ALJ's step four determination was improper. At step four, the ALJ found that Lindley was capable of performing her past relevant work as a field auditor. This listing is for a sedentary work position which "involves sitting most of the time, but may involve walking or standing for brief periods of time." Dictionary of Occupational Titles ("DOT") 160.167-030.[8] Lindley first argues that the ALJ failed to make specific findings of fact as to the physical and mental demands of a field auditor. This argument is without merit, as the ALJ cites to the DOT in his decision, and the DOT specifically lays out both the physical and mental demands of this job. Simply because the ALJ did not cite these in his decision does not mean he did not take them into consideration when determining if Lindley could perform this particular job. In fact, the decision reads just the opposite.

Her next argument involves the ALJ's consideration of the number of days she missed at her previous job.[9] The Court finds this argument persuasive. Lindley testified at the hearing that

---

[8] In her initial brief, Lindley makes several arguments regarding the requirements of this position which are incorrect. This position does not require Lindley to "be frequently walking around" nor will she "frequently encounter ropes, scaffolds, or ladders and dangerous machinery." Pl.'s Brief at 21. The listing also does not indicate that this job requires "standing at approximately 44% of the day and walking at 25% of the day." *Id*. at 22. The Commissioner points this out in her response brief. Presumably, Lindley recognized her errors because she does not make these same arguments in her reply brief.

[9] Lindley also argues that the ALJ provided a deficient RFC that failed to account for numerous limitations. She argues that this then led to incomplete hypotheticals provided to the vocational expert. Because the Court found no error in the ALJ's RFC determination, this argument is without merit.

she was terminated from her last job at Walgreen's because she missed too many days of work. R. at 57. The record also reflects that Lindley was reassigned from her position as a field auditor because she missed over 100 days of work in her last year of employment. *Id*. at 217. The ALJ noted this in his decision stating:

> In addition, the vocational expert testified that if the claimant took excessive days off work, more than 2 days per month, or if she took frequent unscheduled rest period during the workday, this would be unacceptable and subject to termination. The undersigned finds the claimant is not credible for the reasons set out above and the record does not document the need to miss work on a frequent basis and no need to take unscheduled breaks during the work day.

*Id*. at 24. The Court does not agree. The record clearly reflects that Lindley is morbidly obese and that she experiences chronic pain in numerous parts of her body. When asked if these conditions could lead an individual to miss work, Dr. Spector, the testifying medical expert, stated, "[t]hat is a common problem, they do miss work quite frequently . . . probably at least twice a month." *Id*. at 36. Based on this testimony, it was error for the ALJ to find Lindley's own testimony regarding the amount of time she needed to take off of work not to be credible.

Despite the Commissioner's arguments to the contrary, at least twice a month is a *minimum* amount—meaning an individual with morbid obesity and chronic pain, like Lindley, will likely miss *at a minimum* two days of work a month.[10] When asked if missing this much work would cause an individual to lose their job, the vocational expert stated, "[t]hat's correct." *Id*. at 64. The record, therefore, reflects that someone with Lindley's symptoms would likely miss more than two days of work each month, and that someone who misses that much work will likely lose their job. This was not adequately addressed by the ALJ who simply stated that "the record does not document the need to miss work on a frequent basis and no need to take

---

[10] The Commissioner argues that "at least twice a month . . . means two or more times a month, not *more than* twice a month." Def. Response at 24.

16

unscheduled breaks during the work day." *Id*. at 24.  On remand, the ALJ shall correct this error and address how Lindley's work absences might affect her ability to perform her past relevant work as a field auditor.

## IV.    CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REVERSED,** and this case is **REMANDED** for further proceedings consistent with this Entry.

SO ORDERED:    09/20/2013

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification